**HISPANIC EDUCATION COMMITTEE, et al., Plaintiffs,**

v.

**HOUSTON INDEPENDENT SCHOOL DISTRICT, et al., Defendants.**

Civ. A. No. H–94–1065.

United States District Court, S.D. Texas, Houston Division.

Dec. 27, 1994.

As Modified Jan. 9, 1995.

608

Frumencio Reyes, Jr., Frank Alvarez, Jr., Houston, TX, for plaintiffs.

Christopher Borreca, Arturo Michel, Kelly Frels, Houston, TX, for defendants.

OPINION ON SUMMARY JUDGMENT

HUGHES, District Judge.

1. *Introduction.*

The Hispanic Education Committee has complained that the Houston Independent School District appointed its new superintendent in violation of both Texas law against secret governmental decision-making and federal constitutional law allowing political expression and requiring equal treatment. Because the district complied with the Texas law for open meetings and because the district did not repress speech nor exclude candidates arbitrarily, the committee will obtain none of the relief requested.

The facts of these transactions, taken in the light most favorable to the committee, present no justiciable controversy.

2. *Background.*

In closed session on January 20th, the board of trustees of the Houston Independent School District voted to ask one of its

members, Rod Paige, to consider being a candidate for appointment as general superintendent. In an open meeting on February 3rd, with all nine members present, the board resolved to "select and offer to employ Paige as the next General Superintendent."

Paige was a professor at Texas Southern University, with 27 years of public school and university teaching experience. As Texas law requires, the district sought and obtained approval of Paige's appointment by the Texas Commission of Education, which issued him a temporary superintendent's certificate. In an open meeting on February 7th, the board voted to approve the specific contract of employment as superintendent that had been negotiated with Paige.

### 3. Claims.

#### A. Open Meetings.

The committee finds two defects in the board's procedures. First, it suggests that, before the January meeting, the board met in numbers fewer than a quorum to discuss the possibility of appointing Paige as superintendent. Second, the committee says that the board should not have met in closed session to discuss Paige's appointment because his potential selection was not the kind of personnel matter that the law permits to be conducted privately. TEX.REV.CIV.STAT. art. 6252–17 (West 1970).

#### B. Free Expression.

The committee complains that improper meetings prevented the community from knowing what the district was doing. It says that community participation in governing the district was truncated, effectively denying the rights that members of the community had to express themselves politically. U.S. CONST. amend. I.

#### C. Equal Protection.

The committee insists that improper meetings were designed to exclude the Hispanic community from the political process. U.S. CONST. amend. XIV.

#### D. Relief.

The committee seeks to block Paige from serving as superintendent and a dec-laration that Paige's appointment as superintendent is void.

#### E. Standing.

The Hispanic Education Committee is an organization of individuals concerned about the district, including voters, taxpayers, and parents of students. While the committee itself will suffer no direct injury by the district's acts, it may present in court the collective grievances that would be common to the aggrieved individuals. America has become a mediated society, where individuals frequently feel compelled to associate into groups to press their arguments. This is true even though a "... group that purports to act in the interests of a class ... cannot predict what decisions will turn out to be in the interests of that class." PAUL CHEVIGNY, MORE SPEECH: DIALOGUE RIGHTS AND MODERN LIBERTY (Temple University Press 1988).

### 4. Open Meetings.

■ Texas law requires governmental policy-making bodies to conduct their decision-making in meetings accessible to the public. TEX.REV.CIV.STAT. art. 6252–17.

### 5. The Invitation.

■ The committee insists that the board's closed session on January 20, when Paige was asked to consider being a candidate, should have been conducted openly. Selection of a superintendent conducted in secrecy would violate the law.

■ At the January 20 meeting, a resolution was proposed and adopted expressing the "desire of the Board that Dr. Rod Paige consider" the position of superintendent. This resolution was an invitation to Paige, not an offer of a position. No formal decision was made.

Other potential applicants for the job of superintendent might easily have been dissuaded from applying for the position when they knew that the decision-makers had implored one person from among their number to seek the job. An insider visibly wanted by the leading insiders is a formidable opponent. The broadest applicant pool, however, could have been discouraged through a variety of

techniques. A short deadline for applications would have discouraged applicants. More politically, the majority of the trustees could have collectively or individually held news conferences to announce their preference for Paige. Those announcements would not have been a "board meeting," nor involved a "board decision". The trustees' preference for Paige's application was simply part of the culture and context of the district and its administration.

### 6. Preparation.

Assuming that trustees met privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action, these conferences are not meetings of the board. Large, formal meetings do not supply the public's needs fully, for the leaders need to have the best information available from all sources. The open forum may exclude some people because the "most formidable debater is not necessarily the most informed, and the most reticent may sometimes be the wisest." THEODORE C. SORENSEN, DECISION-MAKING IN THE WHITE HOUSE 62 (Columbia University Press 1963). The real question is whether informal discussions became a substitute for a formal deliberative session of the governing body.

■ The informal discussions among members of the board of trustees reveal no systematic attempt to circumvent the public's interest in voicing opinions about a new superintendent, nor do they reveal a conspiracy to appoint Paige without properly obtaining approval by the entire board in public. Regardless of earlier discussions, Paige was elected in an open meeting that fully satisfied the requirements of Texas law. The board could adopt the recommendation of one of its committees without discussion, but the formal action would not convert the earlier working sessions of the committee into a decision of the board.

■ There are no manageable standards by which to judge informal discussions among trustees. Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the board's ability to

function. It is for exactly this reason that notice requirements apply only to meetings involving at least a quorum of members. Texas law mandates simultaneous public access to actions taken when a quorum is present. With fewer than a quorum present, nothing can be formally decided; without a formal decision, no act is taken. Without action, there is no illegality. *Acker v. Texas Water Com'n,* 790 S.W.2d 299 (Tex.1990).

Inherent in an executive position is the duty to make rational decisions and to take responsibility for the consequences. Important decisions should not be made casually, but informal information may be as important as formal procedure in reaching the correct result, whether the decision needs to be rational, representative, or efficient.

The board of trustees is a body of publicly elected officials whose job it is to make decisions for the entire community. This job involves meaningful reflection and extensive preparation for decisions, including discussions among members of the board. Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business. The problem of the length of time required to conduct those sessions alone would prohibit adopting that policy. Trustees are not to be treated as if they were jurors, for instance, rather than policy-makers because the function of a jury differs radically from that of a trustee. Restricting the trustees' opportunities to inform themselves, to negotiate, to build coalitions, and to propose tentatively would be a disservice to the voters and students of the district, who would lose the benefit of careful reflection and preparation.

### 7. Decision.

The actual decision to appoint Paige formally to the position of superintendent was undisputably made at an open meeting in full compliance with Texas law. Earlier discussions of Paige's candidacy for the position were not final decisions and thus not illegal. The actual decision to appoint Paige was

made at an open meeting with all nine board members present.

8. *Personnel Exception.*

Because Paige was not an officer or employee of the district when the board met in closed session to discuss his employment contract, the committee urges that the part of the law allowing closed meetings for personnel matters does not apply to him. Paige could not be a trustee and an employee of the district at the same time. Because he had to resign from the board before being appointed superintendent, the committee argues that the question of whether to make an offer to Paige and the specific terms of the offer were not personnel matters.

 The expression of interest in Paige by the board and the negotiation with him over the terms of a contract for his employment are personnel issues. The law allows closed sessions for the discussion of personnel, whether the position is filled or vacant, whether an employee is to be demoted or promoted, and whether the person is a prospective or current employee. The law does not restrict the non-public procedure only to actions affecting a current employee. TEX. REV.CIV.STAT. art. 6252–17, § 2(a)(1).

9. *Freedom of Petition, Expression, and Assembly.*

 Free expression yields free minds, free markets, and a free people. The right of expression is immunity from verbal repression—anticipatory or retaliatory. The people to whom the right attaches are all individuals. Individuals may exercise their right in private and public. No government may enter a community to limit discussion about itself by citizens, voters, taxpayers, or residents. No part of the Houston Independent School District has attempted to limit the expressions of the Hispanic Education Committee or of anyone else in private or in public.

 The district afforded people opportunities to discuss the selection of a new superintendent. In addition to the opportunities for direct contact with individual trustees, two sessions of the board had agenda time for the public to address the board. The essence of the committee's complaint is that it was not allowed to address the full range of its concerns *at a meeting of the board.* The right to speak does not oblige others to furnish a stage and audience.

As Justice Brandeis observed, "sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Public meetings for general comment by individuals and interest groups are an important technique of governing, even if one assumes that only heat and no light will be generated. As true as that is, the constitution does not require those sessions to be held.

The board held an open forum on Paige's appointment during its February 3 meeting. Although the time was limited, individuals were allowed to speak their opposition, and none was punished. During the meeting at which Paige was elected, members of the community expressed their opinions about school matters, including the election of the new superintendent. The board's refusal to hold more meetings may lessen the newsworthy opportunities, especially limiting occasions when dissidents get exposure in the news media. Unheld meetings for the exchange of words no more limits the individual's right to speak than did Calvin Coolidge's taciturnity.

 The district has not impeded those who agree with it or those who disagree. The board moved quickly and lawfully to fill its chief administrative position. If its haste left less time for public debate than some would have preferred, their remedies are speech, assembly, and petition. Members of the community may try to convince the trustees to take more time on the next issue, oppose the trustees at the next election, or object to other projects the trustees want to adopt. The right to free expression allows the people to retaliate—the very thing the government may not do.

During the whole gaggle of events from the occurrence of the vacancy through to the appointment of the new superintendent, the board was subjected to the buffeting of letters, press conferences, speeches, meetings,

and the rest of the wonderful cacophony of a free people disagreeing.

### 10. *Superficial Distinctions in Participation.*

 Inclusion or exclusion based on superficial and irrelevant criteria like ethnicity would be the kind of arbitrary government action that the constitution was established to prevent. When the board does choose to furnish an open forum, it cannot limit access unless the restriction bears a strong relation to a critical governmental interest directly implicated in the furnishing of the forum, like time limits. Even then, it cannot use a criterion for exclusion that includes the content of the expected speech. On the other hand, not all meetings are open forums. In ordinary meetings, a public body may invite whomever it wishes to speak, and that invitation can be based entirely on the content of the expected speech. No one was excluded from the open forums based on Hispanicity or opposition to Paige.

### 11. *Superficial Distinctions in Selection.*

 The board also could have acted arbitrarily by choosing a superintendent based on race, sex, or religion. Although the board can consider the effect of its choice in signalling its commitment to diversity and other subjective aspects of his leadership role in the district and although the person selected by the board to be the chief executive officer is himself the product of the political process, the board cannot rely on a simplistic formula that makes one class of people wholly ineligible.

The board of trustees of the Houston Independent School District is visibly diverse and, more important, vocally diverse, so that any presumption of residual dominance from the days of legally-imposed segregation is fully erased. Paige himself is black, and the blacks were the official victims historically.

 The committee claims that racial discrimination occurred in the appointment of Paige as superintendent; however, the appointment of someone who happens to be black to the position of superintendent in this district can hardly be said to have been done arbitrarily. The District's voters are of various racial and ethnic origins, as are its students. None of these groups was given preference in the hiring process, and neither was any group discriminated against.

For background, the district is highly diverse, composed of large percentages of voters and students of various associations.

| Voters | Students |
|---|---|
| 364,008 | 200,613 |
| 43.93% Anglo | 12.2% Anglo |
| 26.87% Hispanic | 49.3% Hispanic |
| 26.46% Black | 35.7% Black |
| 2.74% Asian | 2.8% Asian. |

A person who becomes superintendent will have some aggregation of racial, national, religious, and regional associations. Today no one is allowed simply to be an American, an educator, or an administrator. The slight ⁴⁄₁₀% edge of Hispanic to black voters illustrates openness rather than discriminatory frustration of the political aspirations of Hispanics.

The undercurrent of complaint is not that the board selected Paige, but that it did not select a Hispanic. Paige does not represent in a meaningful way all black people any more than the committee can claim to represent all Hispanic people. Diversity persists in the smallest, most insular ethnicities; the American system draws strength from the diversity within as well as between apparent groupings in our community. "There are strong minds in every walk of life that will rise superior to the disadvantages of situation, and will command the tribute due to their merit, not only from the classes to which they particularly belong, but from the society in general. The door ought to be equally open to all. . . ." *The Federalist* No. 36, at 222 (Alexander Hamilton) (Wesleyan ed., 1961).

### 12. *Participation.*

 The committee does not think that its constituency was consulted or its interests adequately considered. While this assertion may be true, the factors influencing the board's decision are a matter of policy, judgment, and politics—not racial discrimination. Taking the politics out of the appointment of

a superintendent would take the democracy out of the district's governing system. The policy choices that are reflected in a particular set of trustees having been elected are entitled to prevail unless the actions trample an element of liberty we all enjoy even from each other, like free expression and regularity in government. "Malfunction occurs when ... though no one is actually denied a voice or a vote, representatives beholden to an effective majority are systematically disadvantaging some minority out of simple hostility or a prejudiced refusal to recognize commonalities of interest." JOHN HART ELY, DEMOCRACY AND DISTRUST 103 (Harvard University Press 1980). The key words are *systematically* and *prejudiced*.

■ Absent evidence of intentional and systematic infliction of disadvantages on a particular group, the mere fact that an individual is a member of a particular ethnic background cannot make his appointment discriminatory.

13. *Conclusion.*

Rod Paige's appointment as superintendent was not part of a plan to circumvent the notice and meeting requirements of Texas law nor part of a scheme to discriminate racially. No one was prevented from expressing an opinion, and no one group had more or less opportunity to express itself than any other. That every faction of the community was not consulted before the appointment does not make that choice illegally discriminatory, and the absence of a quorum whenever his candidacy was discussed between trustees does not transform those informal discussions into cabals to subvert public view of the selection decision. Important decisions require preparation as well as a visible decision, and the individual members of the board did not evade Texas law by conferring with one another, staff members, interest groups, and other individuals.

■ Public debate must not be repressed by the government, but governmental agencies are under no constitutional duty to listen to a particular point of view or to afford an attractive forum for that point of view to be presented to it. The right to petition the government does not include a power to persuade.

### FINAL JUDGMENT

The Hispanic Education Committee
Texas Association of Chicanos in Higher Education
Guadalupe San Miguel, Jr.
Marcia Olivares
Rosemary Covalt, and
Alfred Santos

take nothing from

Houston Independent School District
Paula Arnold
Carol Mims Galloway
Olga Gallego
Jose Salazar
Arthur Gaines, Jr.
Don McAdams
Cathy Mincberg
Ron Franklin
Robert C. Jefferson, and
Rod Paige.